JAMES C. DAVIS, Director-General of Railroads v. HUNT, WASH-INGTON & SMITH.

Middle Section. December 10, 1927.

No petition for Certiorari was filed.

1. **Carriers.** **The mere delivery of goods to a carrier does not necessarily import an absolute promise by the shipper to pay the freight.**
   The mere delivery of goods to a carrier does not necessarily import under the law an absolute promise by the shipper to pay the freight, but it may be shown by the bill of lading or otherwise, that the shipper of the goods was not acting in his own behalf and that this fact was known to the carrier; that the party intended not only that the consignee should assume the obligation to pay the freight, but that the shipper should not assume any liabilities therefor.

2. Carriers. Evidence. Evidence held to show shipper did not promise to pay the freight.

In an action by the director general of railroads to recover certain freight charges where the evidence showed that the defendants had sold lumber to a company in Chicago which had sold it to the government, and that it was agreed that defendants should ship the lumber, "freight paid," and collect the amount from the purchaser as a part of the purchase price and that defendants so billed the lumber; but the railroad agent, not knowing the freight rate, changed the bills of lading without defendant's knowledge or consent and shipped the lumber, "collect," over their protest; held that there was no liability on the part of the defendants to pay the freight and the same could not be collected.

3. Carriers. Agents at destination are charged with knowledge of agent at point of origin and such knowledge will be imputed to the corporation.

Where the evidence showed that the agent of the railroad at the point of origin had full knowledge of the shipment and that the shipper was to prepay the freight, held that this knowledge was imputed to the agent of the carrier at the destination. Knowledge relating to the business of the agency acquired by one agent when acting for the same corporation within the scope of his authority concerning matters about which he is acting will be imputed to the corporation.

4. Carriers. Estoppel. Where shipment was actually on the way before shipper received altered bill of lading held shipper was not estopped by receiving the same.

In an action to recover certain freight charges where the shippers billed the goods out, "freight paid," and the company altered the bill of lading and shipped the goods "freight collect," and after the goods were on their way, forwarded the bill of lading to the shippers, who in turn collected the purchase price, less freight, from the seller thereon held, that since the goods were already in transit the shippers had no other alternative, and their action worked no estoppel.

5. Carriers. Where goods are sold f. o. b. it ordinarily contemplates that the shipper is to pay expenses to that point, but evidence may be introduced to show otherwise.

Without more, where goods are sold f. o. b. a certain point, it contemplates that the goods are to be delivered there at the expense of the seller and the other expenses thereafter are to be borne by the purchaser. But in determining these facts, the whole contract, correspondence and the acts of the parties may be looked to, and in many instances the freight charges may be prepaid and added to the invoice price and thus become a part of the purchase price as contemplated in the instant case.

Appeal from Chancery Court, Davidson County; Hon. John R. Aust, Chancellor.

Affirmed.

Albert W. Stockell and John B. Keeble, of Nashville, for appellant, Director-General.

Pitts, McConnico & Hatcher, of Nashville, for appellees, Hunt, Washington & Smith.

CROWNOVER, J. The bill in this cause was filed against the defendants, as consignors, to collect $2458.47, and interest, freight charges on four cars of lumber shipped from Nashville, Tennessee to the supply officer of Navy Yards at Mare Island, California over

complainant's railroad and connecting lines then operated by the Director-General of Railroads, under authority of the Federal Control Act of Congress passed March 21, 1918.

The defendants denied liability. It was insisted that they were not the real consignors, as the carriers were instructed not to let the cars move forward until defendants had opportunity to prepay the freight charges, which instructions were violated by the carrier; that the lumber had been sold by the defendants to D. K. Jeffris Lumber Company, of Chicago, and that company had in turn sold the same to the Navy Department of the National Government, and the defendants had agreed to ship the same to the supply officer of the Navy Department, freight prepaid, and to draw on the Jeffris Company for invoice price plus freight charges; and that although the contract thus provided, of which the carrier had knowledge, yet it violated the instructions, altered the bills of lading, and, over defendants' protest, made said shipments freight charges collect, and delivered said shipments at destination without collecting the freight charges. It was therefore insisted that the defendants never actually entered into any contract for shipment, that the shipments were thus made on complainant's own responsibility, and were delivered at destination without the collection of the freight charges; and, that, the supply officer, with knowledge, paid the Jeffris Company the full invoice price plus freight charges, without deducting said freight charges.

The facts necessary to be stated are that, in April, 1919 Hunt, Washington & Smith, a copartnership, sold four cars of lumber f. o. b. cars Nashville, at prices named, to the D. K. Jeffris Lumber Company, of Chicago, a corporation, which lumber was sold by the Jeffris Company to the supply officer of the Navy Yard at Mare Island, California, and defendants agreed to ship by way of Louisville & Nashville Railroad, freight charges prepaid, and to draw sight drafts on the Jeffris Company, with bills of lading and National Inspection Certificates attached, for the invoice price plus the freight charges. When the cars were loaded, straight bills of lading, standard form, not negotiable, were made out by the shippers, in triplicate, in which Hunt, Washington & Smith were designated as "shippers," and the supply officer of the Navy Yards consignee, freight charges "to be prepaid." The defendants desired to be permitted to prepay the freight in order to include the amount of such freight charges as a part of the purchase price in their drafts as contracted.

The contract of the Jeffris Company with the Navy Department provided for the delivery of the lumber f. o. b. Mare Island, California, freight prepaid, and under this contract it was incumbent on the Jeffris Company to prepay the freight and add it to the invoice as it was a part of the purchase price.

After these triplicate bills of lading were written and signed by the defendants, they were delivered to the agent of the carrier at

Nashville, Tennessee, and the cars were removed from the defendant's siding out into the freight yards of the carrier, but were held in order that the railroad's agents might ascertain the rate so that the defendants could prepay the freight charges; but it appears that the railroad agents did not ascertain the rate and failed to give the rate to defendants, as they did not have the barge rate from South Vallejo, California to Mare Island.

Afterwards the railroad agents inquired of the defendants whether the shipments could not be made "freight charges collect," but the defendants replied that it would not be satisfactory, and then explained the contract that they had with the Jeffris Company, and stated that if the shipments were made before payment of freight charges they would have no opportunity of including the freight charges in their drafts as contracted, and stated that if the cars were thus moved it would be only on responsibility and authority of the carrier and over their protest.

The cars were afterwards forwarded on instructions from the carrier's local freight agent. The bills of lading were altered and changed by the railroad agents from freight charges "to be paid" to charges collect, without defendants' knowledge or consent, and one copy was retained by the railroad and the other two copies were delivered by mail to the defendants, after the cars were on the way. The defendants, having no other alternative, notified and drew drafts on the Jeffris Company for invoice price, less two per cent discount for cash, without including the freight charges, which drafts were promptly paid.

The Jeffris Company on being advised of the manner of shipment, wrote the agent of the delivering carrier at San Francisco, California explaining the situation and requested that the writer be at once given the correct freight charges so that remittance could be made therefor before arrival of the shipments, which letter was inadvertently returned to the Jeffris Lumber Company, upon receipt of which said company then wrote the carrier's local agent at South Vallejo and enclosed the former letter, which was received by the South Vallejo agent before the shipments arrived. When the shipments arrived at South Vallejo that agent completely ignored the letter, marked the bills of lading as having been prepaid and delivered the shipments to the Barge Line operating between Vallejo and Mare Island, and gave as his reasons for so doing, that Mare Island was a non-agency station, and that the freight claim association rules and laws provided that where the shipments originating on other lines, were destined to nonagency stations the freight charges must be fully prepaid by the consignor, and that shipments for Mare Island, unless covered by government bills of lading, were all required to be paid, and that the supply officer of the Navy Department refused to pay the freight charges or to issue a government bill of lading, as

his contract with the Jeffris Company provided for shipment f. o. b. Mare Island, freight prepaid; and, under the circumstances, he was authorized and instructed to mark the shipments prepaid, and to charge the freight against the initial carrier or originating railroad, whose duty it was to collect from the shippers.

When the shipments were delivered to the supply officer of the Navy Department he paid the Jeffris Company the full invoice price plus the freight charges and made no deduction for said freight charges. The carrier's agents had no further communications with the Jeffris Company at that time, and made no efforts to collect from the Jeffris Company until in 1921. The initial carrier was called on to collect the charges at the point of origin, but no notice was given the defendants that the freight charges were not paid until December, 1919, when complainant's agent requested them to take the matter up with the Jeffris Company, which was done but without results, and in 1922 payment was demanded of the defendants, after the Jeffris Company had become insolvent and had ceased to be a going concern, which was refused and this suit resulted.

The invoice price of the shipments was $4593.40 and this suit is for $2458.47.

Much testimony was read to the Chancellor, who decreed that the grounds of recovery were without merit, and dismissed the bill. The complainant appealed and has assigned errors which, in substance, are as follows:

(I)   That the Chancellor erred in dismissing the bill:

(a)   Because the defendants were the consignors as they consigned the shipments in their own name, with right of stoppage in transit should their drafts be dishonored.

(b)   Because the defendants could make no contract of transportation different from that available to the public generally, as no bill of lading or contract of shipment was authorized by the classification or tariffs in effect, which would relieve the consignor from liability for freight charges.

(c)   The defendants, having contracted personally, could not relieve themselves from liability, by bringing to attention of carrier any special circumstances constituting estoppel to collect the charges from one liable therefor.

(d)   Because the contract for transportation had been partly carried into effect before the question as to forwarding the shipments collect arose, and if the carrier disobeyed the instructions this was but a collateral matter and did not alter the relationship of the parties as to the shipments.

(e)   Because the defendant ratified and adopted the altered contract of transportation by accepting the bills of lading as changed, by allowing the shipments to go forward and by drawing the drafts on the Jeffris Company.

(II)   The court erred in finding and decreeing that the defendants did not personally make the contract for transportation after the carrier had been placed on notice that the Jeffris Company had directed how the shipments should be made, and the evidence preponderated against the finding and decree in this respect because the defendants personally contracted for the transportation in order to control delivery, and did not contract on behalf of the Jeffris Company for transportation.

(III)   The court erred in not rendering a decree for complainant, because it affirmatively appears by a preponderance of the testimony that:

    (a)   The defendants had contracted for the transportation.

    (b)   That having contracted personally for the transportation and obtained the service, they necessarily incurred the obligation to pay for the service.

(IV)   There is no evidence to support the court's finding of facts and decree, because:

    (a)   The defendants had contracted personally for the transportation.

    (b)   That having contracted personally and having obtained the service, they necessarily incurred the obligation to pay for the service.

We may say at the outset that we agree with the opinion of the able Chancellor, both on his finding of facts and conclusions of law, and we are of the opinion that the assignments of error are not well made.

The decision of the United States Supreme Court in the case of the Louisville & Nashville Railroad Company v. The Central Iron & Coal Company, 265 U. S., 59, 68 L. Ed., 900, is determinative of every legal phase of this controversy. That case was decided in 1924 upon a controversy that arose in 1917, and was reviewed by this court in the case of Nashville, Chattanooga & St. Louis Railway v. Murphree et al., 2 Tenn. App. Rep., 482, hence it is not necessary for us to go into great detail in this case.

The Chancellor after making a detailed statement of the facts of the case said:

    "Upon these facts and the authority of C. C. C. St. L. Ry. v. Southern Coal & Coke Co., 147 Tenn., 433, complainant insists the mere delivery of the goods for shipment by defendants, under the circumstances of the case, imports, as a matter of law, an absolute promise to pay the freight charges and that an agreement to the contrary is void. It is to be noted, however, that in the above cited case the shipper and the carrier entered into an actual contract of affreightments whereby the goods were forwarded without prepayment of the freight by the shipper. In

the instant case the shipper never consented to the terms upon which the carrier made the shipment, but refused to make such an agreement, and the carrier arbitrarily took the matter under its exclusive control and forwarded the goods on its own terms and over the shipper's objection, and thus deprived the shipper of his remedy to protect himself against the freight charges.

"I am of opinion the principles of law declared by the Supreme Court of the United States in the case of L. & N. R. R. v. Central Iron & Coal Co., 265 U. S., 59, decided May 5, 1924, are applicable to the case in hand.

"In that cause the Central Iron Company, in January, 1917, sold Tutwiler and Brooks ten car loads of coke to be delivered f. o. b. cars at the seller's plant at Holt, Ala. Before delivery by the seller, the purchaser sold the coke to Great Western Smelters Corporation, of Mayer, Arizona. At the request of Tutwiler and Brooks, and upon their agreement to pay freight, the Central Iron Company delivered the cars to the L. & N. R. R. and directed shipment to order of Tutwiler and Brooks, Mayer, Arizona, notify Great Western Smelters Corporation. The bills of lading, containing section 8 above quoted, were delivered by the Iron Company to Tutwiler and Brooks. That firm made draft, bills of lading attached, against the Smelters Corporation which was paid; The Smelters Corporation presented the bills of lading to the delivering carrier and paid $5,082.15, the amount freight then demanded. The freight legally payable was $8,544.-16, but the undercharge was not discovered until some three years later. Payment for the undercharge having been demanded of the Iron Company and refused by it, suit was brought to enforce the collection on the ground the shipper was responsible for the freight. The court said:

" 'But delivery of the goods to a carrier for shipment does not, under the Interstate Commerce Act, impose upon a shipper an absolute obligation to pay the freight charges. The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract, subject to the rule which prevents discrimination . . . Where payment is deferred the contract may provide that the shipper agrees absolutely to pay the charges; or it may provide merely that he shall pay if the consignee does not pay the charges demanded upon delivery of the goods. Or the carrier may accept the goods for shipment solely on account of the consignee; and knowing the shipper is acting merely as the agent for the consignee may contract that only the latter shall be liable for the freight charges . . . We must therefore determine what promise, if any, to pay freight charges was in fact made by the Central Company.'

"Then, after stating that the bill is looked to primarily to determine the contract, and that the shipper is presumably the consignor and a promise to pay charges by him is inferred, the court continued:

"'But the inference may be rebutted as in case of other contracts. It may be shown by the bills of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the consignee should pay the freight but that the shipper should not assume any liability whatever therefor.'

"In the instant case the carrier knew defendants had sold the lumber to the Jeffris Lumber Company, and that they were proposing to make the shipment at the request and in behalf of that corporation. Mr. Knox was most thoroughly apprised of defendants' unwillingness to agree the cars should move, unless and until they could prepay the freight and protect themselves for the advance by drawing with bills of lading attached against their purchaser.

"Defendants made no such contract as the unauthorized alteration of the bills of lading now in evidence, and when the carrier, over the shipper's protest, forwarded the cars with freight to be collected at destination, it must be that the carrier is held to have consented that it would look alone to the real owner or the consignee and not to the shippers.

"And had the carrier performed the duty thus cast upon them and the freight had been demanded for the owner, who was clamoring for a chance to pay before delivery, or had they required the consignee to pay, which could easily have been done and the amount withheld out of the payment to the Jeffris Company, they would have had their freight long ago, and this belated attempt to collect from one who was not the owner and had never agreed to such terms of shipment, and who now has no chance for protection or reimbursement, would never have been instituted."

We thoroughly agree with the foregoing conclusions of the Chancellor. The Supreme Court of the United States in the above cited case of Louisville & Nashville Railroad Company v. The Central Iron & Coal Company, clearly lays down the principle that the mere delivery of the goods to the carrier does not necessarily import, under the law, an absolute promise by the shipper to pay the freight; that it may be shown by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; and that this fact known by the carrier, that the parties intended not only that the consignee should assume the obligation to pay the freight, but that the shipper should not assume any liability therefor.

The defendants sold the lumber f. o. b. cars at Nashville and as an accommodation to the Jeffris Company, agreed to ship it to the supply officer of the Navy Yards at Mare Island, and to prepay the freight, which freight charges were to be a part of the purchase price, and after such delivery to the carrier, the shippers were not the owners and real consignors, of all of which the complainant had knowledge. Notwithstanding these facts, the complainant's agents altered the bills of lading without defendants' knowledge or consent from freight prepay to freight collect, and then made shipment before defendants were advised of the change; hence the shipments were made without any actual agreement.

We think that the case of Cleveland, etc., Railway Co. v. Southern Coal & Coke Co., supra, has no application, as the shipper and the carrier in that case, entered into an actual contract of affreightments whereby the goods were forwarded without prepayment of freight. In the instant case the shippers never consented. In a foot note at the bottom of the page in the case of the Louisville & Nashville Railroad Company v. The Central Iron & Coal Company, supra, the Supreme Court of the United States said that in this Tennessee case and other cases "it is erroneously assumed that the mere fact of delivery of goods for shipment imports, under the Interstate Commerce Act, as matter of law, an absolute promise to pay the freight charges, and or that an agreement to the contrary is void."

The Supreme Court of the United States in that case held that if a shipment is accepted, the consignee becomes liable, as a matter of law for the full amount of the freight charges, whether they were demanded at the time of the delivery, or not until later.

The record discloses that the carrier and the consignee were one and the same at the time of the shipment, that is to say, the Louisville & Nashville Railroad Company and the connecting carriers were under the federal control. The record further discloses that the United States Government, as consignee, paid the full price for said four cars of lumber, including freight charges, and that the Jeffris Company, the real owner wrote and mailed a letter to the agent of complainant at South Vallejo, California offering to remit for the freight charges in question if it was furnished with the correct amount; but said agent did nothing and no effort was made by complainant to collect from the real owner until it had become insolvent. It cannot be insisted that the agents at destination did not have knowledge of the whole transaction, as it was the duty of the agents of the carrier at the point of origin to notify the agents at destination, of all these things. Knowledge relating to the business of the agency acquired by one agent when acting for the same corporation, within the scope of his authority concerning matters about which he is acting, will be imputed to the corporation. See, 1 Elliott on Railroads, 3 Ed., sec. 264, pp. 421-422.

Hence, where the carrier and the consignee are one and the same person it would be most inequitable to hold that it could violate an agreement, ship without authority in violation of instructions and thus defeat the shippers' clear intention, and then hold them liable for the amount of the freight charges, though they were absolutely at no fault. It would amount to confiscation.

It is insisted by appellant that the defendants by accepting the altered bills of lading and drawing drafts on the purchaser Jeffris Company they thereby ratified and adopted the altered contract of transportation. This assignment of error is based upon a misapprehension of the facts of this case. Since we have already pointed out in this opinion that the four cars of lumber had been way-billed out of Nashville before the defendants actually received the altered papers, it is sufficient to say that there was nothing else for the defendants to do but to draw drafts on the Jeffris Company and collect the price of the lumber; hence we think there is nothing in this proposition.

It is also insisted by appellants that the defendants were the consignors as they consigned the shipments in their own name with the right of stoppage in transit should their drafts be dishonored. If this made them liable as consignors, then in the case of the Louisville & Nashville Railroad Company v. the Central Iron & Coal Company, supra, the Central Iron & Coal Company by shipping in its own name the carloads of coke also preserved its right of stoppage in transit, in the event the consignee had not paid for the coke. The Supreme Court of the United States in its opinion in that case said nothing about the right of stoppage in transit, and we are unable to see that such rights have any legal connection with the liability or nonliability to pay freight charges. We think the case of Treadwell v. Aydlett, 56 Tenn., 388 is not in point, and has nothing to do with the liability of the shipper, as the right of stoppage in transit presupposes that the seller had parted with the possession as well as property in the goods.

Without more, where goods are sold f. o. b. certain point, it contemplates that the goods are to be delivered there at the expense of the seller and the other expenses thereafter are to be borne by the purchaser. But in determining these facts the whole contract, correspondence and the acts of the parties may be looked to, and in many instances the freight charges may be prepaid and added to the invoice price and thus become a part of the purchase price as contemplated in this instance. See, United States v. Andrews & Company, 207 U. S., 229, 52 L. Ed., 185. Hence we think there is nothing in this proposition.

It results that all the assignments of error must be overruled and the decree of the Chancellor affirmed. The costs of the cause, in-

cluding the cost of the appeal is decreed against appellant and the surety on the appeal bond, for all of which execution may issue.

Faw, P. J. and DeWitt, J., concur.